Jones, Ch. J.,
said, that since the case had been argued before the court, several new authorities had been laid before it, and as the question was altogether a new one, the court would defer giving any decision until next Monday.
Mr. Lord said that the debts General Henderson had incurred were not on his own account, but for the Texian government. He had signed a paper in blank as agent for Texas, and was extremely surprised to find that the person with whom he left it had used it in the manner he did.
The plaintiff’s counsel controverted this statement. Mr. Lord presented several other considerations, showing the importance of a speedy decision.
Oaklet, J.
We admit all this, but the rights of all the parties concerned, and the importance and novelty of the question to be decided, render it incumbent on the court to consider it thoroughly before they come to any decision on it.
*626 Jones, Ch. J.
As far as I can see, it is entirely a new question, and therefore requires serious consideration. We think we ought not to limit the time short of next Monday, as we do not know what authorities are contained in the papers which have been handed us to-day, until we examine them.
Mr. Lord¡
If these papers are to be made any foundation for the decision of the court, I should like to re-argue the question to-morrow. But I thought we had made an arrangement to have it decided to-day.
Jones, Ch. J.
We will take from the plaintiff any papers he chooses to give us, and also any papers you choose to give us, and we shall examine them all.
Oaklet, J.
These papers contain authorities from the English law, which the counsel says are applicable to this case.
Mr. Bidwell said the papers which he had handed the court contained, among other cases, that of Viveach and others v. Becker, who was arrested in England for debt, and set up in defence his privileges as consul to the Duke of Sleswick Holstein, Oldenburgh. In this case, Lord Ellenborough said, that although the law on which the defendant relied was drawn up so comprehensively as to include all cases intended to be, embraced by it, it did not comprehend the case in question, and that the defendant was as liable to arrest as any other merchant. The papers also contained another case, in which Samuel Pulache was accredited by the Emperor of Morocco as ambassador to Holland, and was also commissioned to make reprisals against Spain, with which power Morocco was then at war. In virtue of this commission, Pulache captured a Spanish vessel and brought her into Portsmouth, where he was proceeded against as a pirate, and his case was not put on the ground as to whether it was lawful, but that he was an ambassador, and therefore could not be proceeded against. The result of the case showed, however, the contrary.
*627 Monday, December 2, 1839.
Oakley, J.,
delivered the decision of the court.
The defendant in this case is the ambassador of the republic of Texas, sent by his government on a mission to the courts of France and England, and received and accredited as such at those courts. Having negotiated a treaty with France, he is now on his return to Texas, with the treaty, to lay it before the Congress of that country, now in session, for its ratification; and he has with him the regular credentials of his official station, which are to be considered as laid before us. On his arrival in this city he has been arrested and held to bail on civil process, issued out of this court, at the suit of the plaintiffs. It does not appear when or where the debt, on which the suit is founded, was contracted, nor is it necessary to inquire, according to the view I take of the case, any further than to infer, as I presume the fact is, that it has not been contracted since his late arrival in the United States.
Upon this state of the case, the question is submitted to us, whether the defendant is entitled to be discharged from this arrest, and whether the process against him ought to be set aside. The defendant contends that he is entitled to such discharge, because he is privileged from arrest, as an ambassador of a sovereign power, travelling through the country, in the execution of the duties assigned to him by his sovereign. On the other hand, it is contended, that such privilege applies only to an ambassador or public minister deputed to this country by a foreign state, and residing here as such.
It is not questioned that a resident minister, received and acknowledged by the executive of the United States, is not subject to the civil jurisdiction of our courts. It is clear that this privilege is founded, not on any municipal law of this country, but on the law of nations. .The act of Congress of April, 1790, (which is in substance like the English act,) cannot be construed as intended to ■confer this privilege. (Jits object is to enforce it, first, by declaring all process issued by any court against such minister void, and secondly, by inflicting punishment upon all persons who may be instrumental in violating *628 tbe minister’s privilege. That such must be the construction of the act, it is to my mind clear, from the fact that its provisions are confined to the case of a minister who has been received and acknowledged by the executive authority; from which it would follow, if the act is considered as creating or granting the exemption, that a public minister arriving on a mission to our government and residing here would not be entitled to any of the privileges of a minister until he should present his credentials, and be publicly received by the president. Now that a minister, thus situated, is entitled to the most important privileges which attach to him after his public reception, is clear, both from the opinions of the most approved writers on the law of nations, -and from the reasons on which such privileges are founded. It was proper that the act of Congress should be confined to the case of a minister after his public reception, inasmuch as it makes penal the acts of oür own citizens, which may be in violation of his privileges, and this could not be done with justice, until the existence of those privileges should be made known by his public acknowledgment by the government.I ,,
I cannot, therefore, yield my assent to the argument, which has been pressed upon us, that the act of Congress has limited the extent to which the privilege of a foreign minister may be enjoyed. I do not suppose that it was intended to abrogate any part of the generally received and acknowledged principles of international law on that subject.
Assuming, then, that the privileges of a foreign minister have their origin and support in the law of nations, it becomes necessary to inquire into the reasons on which that law is, founded. They are, in substance, as I find them laid down in Vattel, that it is necessary for nations to treat with each other for the good of their affairs — that each has a right of free communication with others for that purpose — that such communication must, of necessity, be carried on by ministers or agents who are the representatives of their sovereign, and that each sovereign state has, therefore, a right to send and receive public ministers; that such being the rights of nations, a sovereign attempting to *629 hinder another from sending or receiving a minister, does him an injury and offends against the law of nations. That, minister representing the sovereign by whom he is deputed, the respect rendered to the minister is not personal, merely, but is, in truth, the respect due from one sovereign to another; and to withhold it is, therefore, an insult which may justly be resented, and thus the peace of nations may be endangered.
It is further laid down that the right of embassies being thus established, the inviolability of ambassadors is a certain consequence of that right, and is indispensable to the perfect enjoyment of it. That such inviolability may be complete, it is necessary that the ambassador should be free from the control or operation of the laws of the country to which he is sent, and from the jurisdiction of its courts, as without such freedom he might not be able to discharge his duty to his own sovereign with firmness and fidelity. [ It is further laid down that inasmuch as the minister is the representative of the dignity and independence of the sovereign, it is impossible to conceive that such sovereign in sending an ambassador intends to submit or subject him to the authority or jurisdiction of a foreign power.
Without dwelling further on this summary of the law of nations, relative to the rights and privileges of public ministers, it is sufficient to observe that the principles contained in it are not only obviously just, but that all the approved writers on international law, both before and since Yattel, concur fully with him as to their nature and extent?]
Yattel, following out these principles, to what, I think, is their legitimate result, holds that an ambassador, passing through the territory of a friendly power, on a mission from his sovereign to another friendly power, is entitled to at least some of the rights and privileges of ambassadors. He says that, although the prince to whom the minister is sent, is under a particular obligation that he shall enjoy all the rights annexed to his character, yet others, through whose dominions he passes, are not to deny him those regards to which the minister of a sovereign is entitled, and which nations owe to each other. They especially owe him an entire safety. To insult him would *630 be injuring his master, and the whole nation; to arrest him and offer violence to him, would be hurting the right of embassy which belongs to all sovereigns. According to Yattel’s opinion, then, the principles of international law on which the rights and privileges of resident ministers rest, apply to a case like the one now before us, so far as to secure to the minister an entire personal safety, and freedom from arrest, and violence, or, in other words, from all restraint of his personal liberty, whereby he may be prevented from discharging his duties to his own sovereign.
This view of Yattel recommends itself very strongly to my judgment. It is founded in good sense and sound reason. It is difficult to designate any principle among those before stated, as sustaining the rights of a resident minister to be exempted from arrest or a restraint of his personal liberty, which does not apply to the case of one standing in the situation of (this defendant. The ambassador of the republic of Texas, is travelling through our country, which is in amity with his own, in the actual discharge of a special duty, assigned to him by his sovereign. He is the representative of the dignity and independence of Texas as a sovereign state. Passing through our territory, on his route to his own country, to complete the mission with which he has been charged, he cannot be presumed to have laid aside his official character, and to have voluntarily submitted himself to the jurisdiction of our courts, as he could not do that without failing in his duty to his own sovereign. His arrest and detention, and, perchance, his personal imprisonment for an indefinite period, might seriously interfere with the successful termination of his mission. The free right of embassy which Texas, in common with all other nations, enjoys, may thus be impaired, and she may feel that an insult has been offered to her dignity, and an injury to her rights, and thus a state of things may arise, which may endanger the national peace. It seems to me, that every principle of national courtesy, of a just observance of the rights and dignity of independent sovereign powers, and of a due regard to the preservation of public peace and of the maintenance of friendly intercourse *631 with other nations, calls upon us to extend to the present case, the established rules of that law of nations, which, by the consent of all, secures the inviolability of a resident ambassador. The two cases seem to me to be equally within the reason of the law.
In thus adopting the doctrine of Yattel, I, of course, have not overlooked the fact, that most, perhaps all the other writers on international law, to which we have been referred, have advanced different views. The most distinguished amongst them, Grotius and Wicquefort, unite in the opinion, that a public minister, passing through the territory of a third power, is not entitled to any privileges as such^and if my decision were to be governed by the mere weight of the opinions of learned men, I should probably arrive'at a conclusion different from that which has resulted from my examination of the subject. But, as mere opinions, they do not address themselves to us with the authority of judicial decisions, and are to be regarded only as they seem consonant with sound reason. I am not satisfied with the ground's on which these writers sustain their opinions, or with the cases to which they refer for their support. Those cases cannot be considered, according to any reasonable view of the subject, as amounting to satisfactory evidence of the practice and usage of nations. The most that can be said of them is, that they are instances of violence, apparently acquiesced in, or to speak more properly, submitted to, in some cases after remonstrances against their legality, and, in all, from motives which cannot be known. They may have been motives of expediency merely, or motives springing from the necessary submission of the weak to the powerful. But in no case happening in times sufficiently modern to be entitled to respect as a precedent, do I find, that the violation of the person of an ambassador, travelling through the territory of a power at peace with his sovereign, has been acknowledged by that sovereign not to be a breach of the general law of nations. And after all, the practice of nations at a remote period, and the opinions of the old writers on national law, seem to me to be entitled of themselves to little weight with us. The law of nations, like *632 other systems of law, is progressive. Its principles are expanded and liberalized by the spirit of the age and country in which we live. Cases, as they arise under it, must be brought to the test of enlightened reason and of liberal principles; and I should as soon think of going back to the times of the English star chamber, to search for the rules that ought to govern us in the protection of the personal liberty or rights of the private citizen, as of referring to the age of Charles V. or of Elizabeth, forjhe principles which ought to regulate the intercourse of nations]]
It was urged, on the argument by the counsel for the plaintiffs, that the exemption claimed in this case could not rest on that necessity of preferring the free intercourse of nations, which alone can justify it, inasmuch as it was not necessary that the Texian ambassador should have entered our territory, on his return from Europe. And that therefore, his coming into our country was in fact voluntary, and a virtual submission, on his part, to the ordinary operation of our laws while within our borders.
It is true that the defendant might have returned to his own country without passing through ours; but we cannot but see that such a course would have been unusual, and probably highly inconvenient. He is returning by the ordinary and established route — that which, in practice, is adopted by almost all men', both public and private. There is at present] little or no direct intercourse between Texas and Europe, and it would be treating the subject in a point of view altogether too narrow, to hold that the defendant, by adopting the ordinary and convenient mode of travelling to and from his place of destination, had thereby intended to abandon his official character, and to enter our territory as a mere private individual, j It may happen, as in the case of some of the German states and of the Swiss Cantons, that a public minister, deputed to them, must, from absolute necessity, pass through the territory of a third power. In such a case, the refusal of a free passage through such territory would be a clear violation of that free right of embassy spoken of by Yattel. The obligation to permit such passage would therefore seem to be positive, and in the exer *633 cise of national courtesy it ought to be permitted by the usual and most convenient route. Any unnecessary impediment thrown in the way of the free passage of the minister impairs the right of embassy possessed by his sovereign. The same principle will justly apply to the case now before us. The right of free communication between nations, which has its foundation in public necessity, is in truth a right to be enjoyed according to a convenience exercised in good faith, and in reference to the usual and established modes of intercourse.]
It was further contended on the argument, that the privilege claimed by the defendant is in conflict with the well-established right of every nation to exclude from its territories all persons at its pleasure. I do not so consider it. Our government may undoubtedly, if it should see fit, send out of the country any resident minister. So may they do with the present defendant. They may direct him to leave our territory, but they cannot arrest and imprison him. In the one case he may return to his own country and complete the objects of his mission, in the other his mission would be interrupted, and, perchance, entirely defeated.
¡It is also contended, that before an ambassador, passing through our country, on a mission to another power, can claim an exemption from the ordinary operation of our laws, it should at least appear, that he had entered our territory by the permission of our government; and most of the writers on international law, who deny the right of a minister,, in the situation of the present defendant, to the privilege claimed for him, seem to agree that if a minister thus situated obtain a passport or safe conduct, as such, from the sovereign of the territory through which he is about to pass, his right of protection by such sovereign becomes absolute. This must be so, according to every sound view of the case. If a sovereign invite or permit the representative of another power to enter his territory for any purpose, it is clear that he cannot, without a violation of all good faith, withhold from such representative all necessary protection. Now, may it not fairly be said that the present case falls within this principle ? The practice, of granting passports, *634 or a safe conduct, to any person, except in time of war, is, as far as I am informed, unknown to our government. No man, I believe, being about to enter our country, either to reside in it or pass through it, ever thinks of applying for permission to do so. Passports, though they may be named in our laws, are either entirely unknown in practice, or of extremely rare occurrence. The truth is, that every subject or citizen of a foreign power finds a passport for entrance into our country, in 'the nature and character of our political institutions. We hold out a standing invitation to all men to come freely among us, and it is doing no violence to good sense or sound reason to say, that foreigners enter our country by, at least, the implied invitation of our government. The defendant, then, could not, in reason, be required to obtain any express consent of the government to come within our territory, in order that he might, when here, enjoy the privileges claimed by him as appertaining to his representative character; so long, at least, as that government permits him to remain.
In coming to the result at which I have arrived in this case, I have not considered, nor do I intend to say, what is the extent of the privileges which may be justly claimed by the defendant. It may be that many privileges clearly secured to a resident minister, as for example, those which refer to his domestic establishment, may not be necessary for the protection of a minister merely passing through the country, in the enjoyment of his personal freedom.
Nor do I intend to say whether the defendant may not, by his continuance in the country, or by his conduct while in it, divest himself of his representative character, so far as by his voluntary act to subject himself to thp ordinary operation of our laws. These áre questions not involved necessarily in the present inquiry.
I am of opinion, that the motion to set aside the process issued in this case and that the defendant be discharged, be granted.
(Jones, Ch. J.,
said, that as the case first came before Judge *635 Oakley, it was thought proper that he should deliver the opinion of the court. Each of the judges had also prepared a short opinion on the subject, but he considered that every thing they could say on the question was embraced in the opinion of Judge Oakley, which was the unanimous opinion of the court.
Mr. Lord informed the court that, in making a motion to set aside the capias, it was not the intention of General Henderson to bring any action against the plain tiffsj]
Defendant discharged.